UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JAYCE P. WALTERS, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. H-11-3562 |
| § | |
| HOOVER & STRONG, INC., et al., § | |
| § | |
| Defendants. § | |

## CLAIM CONSTRUCTION MEMORANDUM AND ORDER

Plaintiff Jayce P. Walters ("Plaintiff" or "Walters") has filed suit against Defendants Hoover & Strong, Inc. ("Hoover") and Roseco, Inc. ("Roseco") (collectively "Defendants"), alleging infringement of U.S. Patent No. 6,279,436 (filed Aug. 25, 2000) ("the '436 Patent"). This case is now before the Court for a determination of various disputed terms in the '436 Patent. This Court held a hearing on August 23, 2012, during which the parties presented argument in support of their proposed constructions.

Based on a review of the parties' filings, the evidence of record, and the oral arguments presented to the Court, the Court hereby **ADOPTS** the following claim constructions.

### I.   BACKGROUND

The present patent case involves the field of jewelry making. The '436 patent describes a method of creating a precise gemstone seat in a jewelry setting. Specifically, the '436 patent claims a method for creating notched surfaces in jewelry settings. The resulting setting prongs have at least three distinct surfaces with each surface corresponding to a profile surface of a gemstone. The gemstone is then set in the notched setting prongs so that portions of the gemstone profile surfaces are received in respective notches. Creating at least three distinct

1

surfaces in the setting results in less material having to be removed from the setting than under the prior art, thereby leaving the setting "stronger and better able to handle deformation in securing the gemstone and subsequent daily wear and tear." U.S. Patent No. 6,729,436 col.5 l.50-51.

The '436 Patent includes four claims, two of which are dependent on the first claim. Parties presently dispute several claim terms, all of which appear in the two independent claims. Both independent claims are set forth below, with disputed terms highlighted in bold type.

>   Claim 1 provides:
>
>   "A method of setting a gemstone having a profile into a metallic base having a **setting of substantially uniform thickness**, the gemstone profile including at least three distinct surfaces, the method comprising the steps of:
>   >   **cutting at least one notch into an inner surface of the setting**, said at least one notch having at least three notch surfaces, each notch surface being complementary to a corresponding profile surface of the gemstone;
>   >   setting the gemstone in the setting so that portions of the gemstone profile surfaces are received in a respective notch;
>   >   securing the gemstone within the base by manually deforming the setting such that the notch surfaces of each notch substantially conform to the corresponding profile surfaces of the gemstone."
>
>   Claim 4 provides:
>
>   "A method of setting a gemstone having a profile into a metallic base having a **setting of substantially uniform thickness**, the gemstone profile including at least three distinct surfaces, the method comprising the steps of:
>   >   **cutting at least one notch into an inner surface of the setting**, said at least one notch having at least three notch surfaces and a pair of corners respectively formed by adjacent notch surfaces, each notch surface being complementary to a corresponding profile surface of the gemstone;
>   >   setting the gemstone in the setting so that portions of the gemstone profile surfaces are received in a respective notch;
>   >   securing the gemstone within the base by manually deforming the setting generally along at least one of said corners such that the notch surfaces of each notch substantially conform to the corresponding profile surfaces of the gemstone."

Plaintiff alleges that Defendants are infringing on all four claims of the '436 Patent. Specifically, Walters claims Hoover's Tru-Seat® line of settings is infringing on the claims of the

2

'436 Patent. (Doc. No. 28, Am. Compl., at Ex. B.)[1] Hoover explains that the Tru-Seat® settings are manufactured by either "stamping the prongs from a formless sheet of precious metal and assembling them into a setting" or "by casting in which the entire setting is made by pouring molten precious metal into a mold." (Doc. No. 52, Defendants' Responsive Claim Construction Brief (hereinafter "Responsive Br."), at 6.) Both methods involve a pre-formed seat that enables the gemstone to be set without having to cut notches in the setting prongs. *Id.*

## II. APPLICABLE LAW

### A. Claim Construction Generally

Claim construction is a matter of law, and thus the task of determining the proper construction of all disputed claim terms lies with the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The standards governing patent claim construction are well established. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996).

Claim construction centers around "the language of the claims themselves, for it is that language the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112). "Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1352, 1360 (Fed. Cir. 2008). Thus, the inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). That starting point is based on "the well-settled understanding that inventors are typically persons skilled in the field of the

---

[1] Roseco is a party to this suit as a reseller of Hoover's products.

3

invention, and that patents are addressed to, and intended to be read by, others of skill in the pertinent art." *Id.*

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In such cases, the terms may not require construction. *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in non-construction of "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in lower court's refusal to construe "irrigating" and "frictional heat"). However, even if the terms involved are "ordinary" words, construction may still be needed if the ordinary meaning does not resolved the parties' dispute about the scope of the claim. *O2 Micro*, 521 F.3d at 1361-62 (citations omitted) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

In any event, in most cases, the meaning of disputed claim terms is not readily apparent. *Phillips*, 415 F.3d at 1314. In such instances, courts should first look to intrinsic evidence to determine if it clearly and unambiguously defines the disputed terms of the claim. *Vitronics*, 90 F.3d at 1585. Intrinsic evidence refers to "the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Id.*[2] If, after examining the intrinsic evidence, ambiguity about a claim term remains, the court may examine extrinsic evidence, such as expert witness testimony, dictionary definitions, and legal treatises. *Vitronics*, 90 F.3d at 1585.

---

[2] The parties do not raise any prosecution history arguments in support of their claim construction. Thus, the Court does not set out the legal standard for considering prosecution history.

4

The Federal Circuit has instructed that "[w]hile a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326-27 (Fed. Cir. 2006).

### B.  The Claims

The claims themselves provide substantial guidance as to the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314; *see also Amgen, Inc. v. Hoechst Marion Roussell, Inc.*, 314 F.3d. 1313, 1325 (Fed. Cir. 2003) ("It is the claims that measure the invention.").  To begin with, the context in which a term is used in the asserted claim can be highly instructive.  *Id.*  Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.  *Vitronics*, 90 F.3d at 1582.  Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  *Phillips*, 415 F.3d 1303.

The determination whether to treat a preamble as a limitation on the claim turns on the importance of the preamble in a particular patent.  *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).  "If the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance of the claim." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999); *see also Bell*, 55 F.3d at 620 ("[W]hen the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.") (emphasis in original); *Catalina*

5

*Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 810 (Fed. Cir. 2002) (finding it significant that disputed phrase in preamble did not affect the "structural definition or operation" of the invention). On the other hand, a preamble should not be read to limit the claim "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina*, 289 F.3d at 808; *see also Pitney Bowes*, 182 F.3d at 1305 (Where the preamble "merely states . . . the purpose or intended use of the invention, . . . the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.").

### C. The Specification

The specification, or the part of the patent where the inventor describes and illustrates the invention in significant detail, "is always highly relevant to the claim construction analysis. . . . [I]t is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The importance of the specification in claim construction derives from its statutory role. *Phillips*, 415 F.3d at 1316. The close kinship between the written description and the claims is reinforced by the statutory requirement that the specification describe the claimed invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112, ¶ 1. Consistent with that general principle, cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. *Vitronics*, 90 F.3d at 1582. In such cases, the inventor's lexicography governs. *Phillips*, 415 F.3d at 1316. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. *Id.* In that instance, as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive. *Id.* The specification may also resolve ambiguous claim terms that are not sufficiently clear to permit the

6

scope of the claim to be ascertained from the words alone. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) (citation omitted) (The specification may limit the claim if "the term chosen by the patentee so deprive[s] the claim of clarity as to require resort to other intrinsic evidence for a definite meaning.").

Notably, while the specification may describe very specific embodiments of the invention, the claims are not to be confined to these embodiments. *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) (quoting *Phillips,* 415 F.3d at 1323). An accused infringer may not limit a claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification . . . ." *CCS Fitness*, 288 F.3d at 1366 (citations omitted). The Federal Circuit has repeatedly rejected the contention that "if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323 (citations omitted). Therefore, "courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee." *Amgen*, 314 F.3d at 1325. There is "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

At the same time, the Federal Circuit has recognized that limiting language in the specification may properly be used to construe the terms of a patent. *Id*. at 1323; *see also Phillips*, 415 F.3d at 1315 ("The claims, of course, do not stand alone. Rather, they are part of a fully integrated written instrument. . . .") (citation omitted). "[T]he descriptive part of the specification aids in ascertaining the scope and meaning of the claims . . . ." *Phillips*, 415 F.3d at

7

1315; *see also Irdeto Access, Inc. v. Echostar Satelitte Corp.*, 383 F.3d 1995, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.") (citations omitted). Carefully reading the specification in view of its purpose – that is, teaching those who are skilled in the art to make and use the invention – will make "clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d at 1323. *See also Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1318 (Fed. Cir. 2006) (holding that the terms of the specification evidenced that the fuel filter was "not a preferred embodiment, but an only embodiment").

### D. Extrinsic Evidence

Although the Federal Circuit has consistently stressed the importance of intrinsic evidence, it has also authorized the use of extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises. *Phillips*, 415 F.3d at 1317. However, while extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318 (Fed. Cir. 2004)); *see also Vitrionics*, 90 F.3d at 1583-84 (noting that extrinsic evidence may be considered only if consideration of the intrinsic evidence does not resolve any ambiguities in the claim terms). Furthermore, extrinsic evidence "may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

The courts have recognized that dictionaries and treatises may be especially useful in claim construction. *Phillips*, 415 F.3d at 1317. Specifically, technical dictionaries may enable a court "to better understand the underlying technology" and the way in which one of skill in the art might use the claim terms. *Vitronics*, 90 F.3d at 1584 n.6.

### III. ANALYSIS OF CLAIM TERMS

The contested terms in this patent are "setting of substantially uniform thickness" and "cutting at least one notch into an inner surface of the setting."[3] Plaintiff argues that neither of the terms require construction, and each should be given its ordinary and customary meaning. (Jayce Walters' Opening Claim Construction Brief hereinafter "Opening Br."), at 1.) Defendants argue that the terms require construction because they either have no ordinary and customary meaning, or the ordinary and customary meaning is broader than the contexts of the '436 Patent supports. (Responsive Br., at 3-4.)

#### A. "a setting of substantially uniform thickness"

Plaintiff argues that "a setting of substantially uniform thickness" is clearly defined in the specification and is not ambiguous. (Opening Br., at 7.) Plaintiff relies on the illustrations in the specification as the primary support for this argument. (Opening Br. 7; Jayce Walters' Reply Claim Construction Brief (hereinafter "Reply Br."), at 3.) Defendants argue that the specification does not define the term; it adds only that the prongs are generally smooth on their inner surfaces. (Responsive Br., at 14.) They further argue that none of the illustrations depicts the setting prongs before they were cut, and therefore the illustrations are also not helpful for understanding the meaning of the term. (Responsive Br., at 14.) Defendants propose that the

---

[3] The parties initially disagreed about the meaning of the term "metallic base" as well. (Doc. No. 49, Joint Claim Construction and Prehearing Statement, at 1.) However, the parties now agree that the term "metallic base" means "the metallic part of the jewelry that includes the setting," and no longer believe that the term needs construing. (Doc. No. 56, Am. Joint Claim Construction Chart, at 1.) Therefore, the Court does not construe the term "metallic base."

9

term be construed to mean "a setting that does not have any notches on its inner surface." (Am. Joint Claim Construction Chart, at Ex. A.) Walters contends this definition impermissibly narrows the claim to only certain embodiments. (Opening Br., at 8.)[4]

Although Walters does not argue otherwise, the Court begins by noting that the preambles to claims 1 and 4 are limiting. This is because Walters chose to use both the preamble and the body of the claims to define his invention. *Bell*, 55 F.3d at 620. The preambles to both claims describe much more than just the purpose of the claim, which is "a method of setting a gemstone . . . into a metallic base . . . ." '436 Patent col.6 l.11-12, 34-35 (filed Aug. 25, 2000). The preambles also explain the type of setting that the claimed method operates on. '436 Patent col.6 l.12-13, 35-36 (describing the method of "setting a gemstone . . . into a metallic base having a setting of substantially uniform thickness. . ."). Nor can it be said that the bodies of claim 1 or claim 4 define a "structurally complete invention." *Catalina*, 289 F.3d at 808. Each claim describes a method that operates on "*the* setting," referring back to the setting that was described in the preamble. '436 Patent col.6 l.15-16, 38-39 (emphasis added). The '436 Patent is a clear example of the patentee choosing "to use *both* the preamble and the body to define the subject matter of the claimed invention." *Bell*, 55 F.3d at 620 (emphasis in original). Accordingly, the Court finds that the preambles to claims 1 and 4 are limiting.

The Court next turns to the proper construction of the term "a setting of substantially uniform thickness." The Court is not persuaded by Plaintiff's argument that the term is

---

[4] The Court notes that parties previously disputed the meaning of the word "setting," a subpart of the term "a setting of substantially uniform thickness." (Opening Br., at 7-8; Responsive Br., at 13-14.) Specifically, Defendants argued that the term "setting" needed to be construed because it was used interchangeably with the term "metallic base." (Responsive Br., at 10-13.) However, because the parties no longer dispute the meaning of the term "metallic base," they agree that the term "setting" does not need to be construed either. (Am. Joint Claim Construction Chart, at 1.) The Court therefore understands the remaining dispute about the meaning of the term "a setting of substantially uniform thickness" to be about the meaning of the words "of substantially uniform thickness." To this end, the Court considers those arguments the parties originally presented regarding the term "of substantially uniform thickness" and the combined term "setting of substantially uniform thickness," but not their arguments about the term "setting." (Opening Br., at 7-8; Responsive Br., at 14-15.)

"commonly used" and "its meaning is clear on its face." (Opening Br., at 7.) Plaintiff cites no evidence in support of this argument, and there is nothing in the record that would allow the Court to extrapolate that the phrase is commonly used or that it has an established meaning in the jewelry industry. The Court agrees that the term is comprised of commonly understood words; however, as discussed in more detail below, the Court must nonetheless construe the term because the preferred embodiment of the invention would not fall within the scope of the claims if the Court were to simply adopt the ordinary meaning of the term.

Plaintiff's argument that the term is clearly defined in the specification is no more availing. (Opening Br., at 7.) The specification never actually defines the term. In fact, the term "substantially uniform thickness" is used only once in the specification. '436 Patent col.4 l.44. There, the specification provides that "[p]rior to using the tool of the present invention, the setting prongs **9** have substantially uniform thickness along their lengths and are generally smooth on their inner surfaces and outer surfaces **10**." '436 Patent col.4 l.43-46. This sentence does not provide any definition, explicit or implicit, for the term "substantially uniform thickness." It simply offers another characteristic of the setting prongs: in addition to being of "substantially uniform thickness," the prongs are also generally smooth on their inner and outer surfaces.

Nor is the preferred embodiment, depicted in Figure 2, any more helpful to Plaintiff's argument. If anything, it provides further proof of the need to construe the term "a setting of substantially uniform thickness." First, Figure 2 depicts the setting prongs as they would appear after the application of the claimed method. Therefore, Defendants rightly contend that the image of the prongs in Figure 2 tells the reader nothing about how the setting prongs appeared before the application of the claimed method. (Responsive Br., at 14.) If Plaintiff means to

11

suggest that Figure 2 reflects the setting *before* the claimed method has been applied, the Court fails to see how the setting displayed in Figure 2 can properly be described as having "substantially uniform thickness." The lay meaning of the term "a setting of substantially uniform thickness" is a setting with a largely unvarying dimension through two of its opposite surfaces.[5] Here, it is clear that the pertinent surfaces are the inner and outer surfaces of the prongs. However, in Figure 2, the distance from the inner to the outer surfaces of the prongs varies as one moves up from the base and toward the top of the setting. Specifically, north of inner surface **93**, the thickness of the setting begins to increase. '436 Patent fig.2. An interpretation of disputed terms that would result in a preferred embodiment falling outside of the scope of the patent claim is "rarely, if ever, correct." *Vitrionics*, 90 F.3d at 1583. Thus, the Court cannot simply conclude that the term "setting of substantially uniform thickness" bears its ordinary meaning.

To resolve the ambiguity and address the problem identified above, Defendants propose that this Court interpret the term as "a setting that does not have any notches in its inner surface." Relying on the part of the specification that explains how the patented method causes material to be removed from the setting prong to form a notch, '436 Patent col.4 l.52-53, Defendants propose that the reader essentially work backwards from the image in Figure 2 and determine what the preferred embodiment looked like before the material was removed. (Markman Tr. 35:23–36:13, Aug. 23, 2012.) According to Defendants, if the reader imagines that the material had not yet been removed by the application of the patented invention, the preferred embodiment

---

[5] The Court has concluded that this is the ordinary meaning of the contested term by reviewing dictionary definitions for the words that comprise the contested term. Webster's dictionary provides the following definitions: Substantial means "being of considerable . . . degree, amount, or extent." Webster's II New Riverside University Dictionary 1155 (1988). Uniform means "being without variation or fluctuation." *Id.* at 1261. Thickness means "the dimension between two of an object's opposite surfaces, usu[ally] the dimension of smallest measure." *Id.* at 1202.

12

would have a setting with an outer surface parallel to longitudinal axis **39** running down from cutting surface **41**. (Markman Tr. 35:23–36:13.)

This definition gives proper meaning to the term "substantially uniform thickness." The Court concedes that the setting with an outer surface parallel to longitudinal axis **39** running down from cutting surface **41** would not have largely unvaried thickness along its entirety. *See* '436 Patent fig.2. Specifically, the thickness of such a setting would begin decreasing as one moved down below the bend in outer surface **10**. '436 Patent fig.2. However, the specification provides that the setting prongs in Figure 2 have "substantially uniform thickness *along their length*." '436 Patent col.4 l.44-45 (emphasis added). The patentee likely intended the "length" of the setting to refer to that part of the prong setting that runs parallel to the longitudinal axis **39**. Absent such an understanding, the description of the setting as being of "substantially uniform thickness" is incomprehensible. The thickness of a prong-type setting, the setting in the preferred embodiment, is inevitably not uniform along its entirety because, before the patented method is applied to the inner surface, the outer surface already has a bend or a curve in it, thereby guaranteeing that the thickness of the prong above the bend or curve will vary from that below the bend or curve. Therefore, to ensure that the preferred embodiment is within the scope of the claims, the Court finds it necessary to construe the claim term in a manner that clarifies that it is not the whole setting that must be of substantially uniform thickness, but rather only that part of it which is parallel to the longitudinal axis. *See Vitrionics*, 90 F.3d at 1583. Defendants' proposed construction of the term as "a setting that does not have any notches on its inner surface" accomplishes this goal simply and without imparting any inappropriate limitations into the claim.

The Court is keenly aware of the Federal Circuit's admonition that claims are not to be limited to the particular embodiments in the specification. *Ventana*, 473 F.3d at 1181. However, by ensuring that the preferred embodiment falls within the scope of the claims, the Court does nothing to exclude other potential embodiments of the claimed invention. The specification provides that the claims apply equally to "bezel-type settings, bead type settings and other commonly used jewelry settings." '436 Patent col.3 l.5-6. While some of these settings may naturally be of uniform thickness along their entirety, and therefore would not have required the clarifying construction so essential for the prong setting, the claimed methods' applications to these types of settings have not, in any way, been limited by the Court's construction. The Court does not construe the claim terms to mean that the claimed methods apply only to prong settings, or to settings that are of uniform thickness along only one part of the setting, or any such thing.

In sum, although the claim language "a setting of substantially uniform thickness" is not clear on its face and is not explicitly defined in the specification, the intrinsic evidence provides sufficient context to enable this Court to interpret the claim term. *See Teleflex, Inc.*, 299 F.3d at 1325. The Court largely agrees with Defendants that interpreting the term as "a setting that does not have any notches on its inner surface" comports with the claims and the specification. Defendants' definition, however, does not account for the fact that the setting need only be of *substantially* uniform thickness. Minor notches or small, accidental dents in the setting would fall within the scope of the patentee's invention. Thus, the Court construes the term "a setting of substantially uniform thickness" to mean "a setting that does not have any noticeable notches along the inner surface."

### B. "Cutting at least one notch into an inner surface of the setting"

Plaintiff again argues that the meaning of the term "cutting at least one notch into an inner surface of the setting" is clear on its face and does not need to be construed. (Opening Br., at 8.) Defendants propose that the term should be construed to mean "using a tool to remove material from the inner surface of a setting of substantially uniform thickness to create at least one notch." (Responsive Br., at 16.) In support of this definition, Defendants cite to numerous passages from the specification that refer to "material to be removed from the setting prong" or "metal that must be removed from the setting prong." (Responsive Br., 16-17; '436 Patent col.4 l.52-53, col.3 l.66-67.) Walters again responds that this impermissibly limits the claims to certain embodiments, because the claims make no mention of using a tool to remove material. (Opening Br., at 9; Reply Br., at 4.)

The Court points out that the entire dispute about this term centers on the meaning of the term "cutting." Defendants' proposed construction leaves in place the remainder of the term, simply rearranging the order of some of the words so that its proposed construction is grammatical. Defendants also replace "the setting" with "a setting of substantially uniform thickness." (Am. Joint Claim Construction Chart, at Ex. A.) The Court finds this addition to be extraneous because the claim preambles already define the setting as being "of substantially uniform thickness."

The term "cutting" is never specifically defined in either the specification or the claims. Because claim terms are generally given their ordinary and customary meaning, the Court starts with the presumption that the term "cutting" bears its ordinary meaning. *O2 Micro Int'l Ltd.*, 521 F.3d at 1360. However, that ordinary and customary meaning is the meaning the term would have to someone skilled in the art of jewelry making, not the meaning the word would have to a layperson. *Id.*

15

The parties present little evidence about what the meaning of the word "cutting" would have to a person skilled in the art of jewelry making. Defendants contend, however, that jewelry making is an old art and many well-known techniques have developed, of which cutting is just one example. (Responsive Br., at 1.) Defendants provide definitions of these techniques, which include cutting, stamping, casting and forging. (Responsive Br., at 1.) Specifically, Defendants explain that cutting is a technique where "an artist starts with a piece of metal, however formed, and then cuts or removes material to make a desired shape." (Responsive Br., at 1.) Plaintiff never responds to this characterization of the term "cutting" as having a particular meaning within the jewelry making field. Instead, at the *Markman* hearing, Plaintiff suggested that "cutting can have some kind of broad ordinary meaning" and that it would include "cutting a figure, for example." (Markman Tr. 41:2–12 (quotations omitted).) When the Court clarified whether a sculptor shaping a soft material like plaster would fall within the definition of cutting, Plaintiff confirmed that he would. (Markman Tr. 41:13–16.)

The Court must reject Plaintiff's proposed broad construction of cutting. By indicating that cutting would embrace activities such as the sculptor shaping a figure, Plaintiff appears to argue that the word cutting should include *all* ordinary meanings of the word. But the law is clear that claim terms must be given their ordinary and customary meaning, as it would be understood by a person of ordinary skill in the art in question. *Phillips*, 415 F.3d at 1313. Curiously, neither party offers any definitions of the term "cutting" from technical dictionaries, or any expert testimony that would help this Court determine how a person of ordinary skill in the art of jewelry making would interpret the term "cutting." Based on the limited information before it, however, the Court must agree with Defendants that, because cutting is one of several

16

established jewelry making techniques, a person skilled in the art would understand "cutting" to refer to the practice of "removing material to make a desired shape." (Responsive Br., at 1.)

Furthermore, this ordinary meaning is confirmed throughout the specification. In discussing the preferred embodiment, the patentee repeatedly states that the present invention minimizes the amount of metal that must be removed to create the setting. *See* '436 Patent col.5 l.25-28 ("The tool **5** and method of the present invention cut a more accurate shape into the setting prongs **9**, thus minimizing the amount of metal that must be removed to form the gemstone seat **1**."); '436 Patent col.5 l.46-49 ("The amount of material removed from the setting **7** is less because the notch **91** does not have to be as deep or as wide as in the prior art.") This comparison of the relative amount of material that must be removed indicates that, not only does the preferred embodiment involve removing material from the prongs, but the prior art also involves removing material to form the setting. This confirms the Court's conclusion that the technique of cutting generally involves removing material to create a desired shape. Furthermore, while the claims are not to be confined to specific embodiments, the embodiments can nonetheless assist in interpreting claim language. Here, both embodiments of the invention function by removing material from the inner surface of the setting to create a notch, further confirming the Court's construction of the term "cutting." '436 Patent fig.2, fig.4; '436 Patent fig.2, col.4 l.25-28 ("In use, the bur cutting portion **33** is positioned to allow the cutting teeth **49** to engage a setting prong **9** . . . . This contact causes material to be removed from the setting prong **9** to form a notch **91** in the inner face **8** of the setting prong.").

The Court therefore construes the term "cutting at least one notch into the inner surface of a setting" to mean "removing material from the inner surface of the setting to create at least one notch." Defendants' proposed construction also adds that a tool must be used to perform the

17

cutting. (Am. Joint Claim Construction Chart, at Ex. A.) The Court finds this qualifier extraneous, as it is self-evident that metal may not be removed from the setting without the aid of some tool.

## IV. CONCLUSION

The Court hereby adopts the following construction of disputed claim terms:

| Term | Construction |
|---|---|
| **a setting of substantially uniform thickness** | a setting that does not have any noticeable notches along the inner surface |
| **cutting at least one notch into an inner surface of the setting** | removing material from the inner surface of the setting to create at least one notch |

**IT IS SO ORDERED.**

**SIGNED** this 24th day of September, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE